AV:JSS:jss
F. #1998R00464
LAURIA1.INF

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

SALVATORE LAURIA,

        Defendant.

- - - - - - - - - - - - - - - -X

I N F O R M A T I O N

Cr. No. _98-1102_
(T. 18, U.S.C., §§
1962(c), 1963(a)
and 3551 et seq.)

THE UNITED STATES ATTORNEY CHARGES:

      At all times relevant to this information, unless otherwise indicated:

<u>INTRODUCTION</u>

<u>Relevant Securities Law Matters</u>

      1.   The United States Securities and Exchange Commission (the "SEC") is an independent agency of the United States government charged with the duty of protecting investors by regulating and monitoring the trading of securities, including the conduct of broker-dealers and brokers of securities, in the United States.

      2.   A central purpose of the federal securities laws is to protect investors from fraud in connection with the purchase and sale of securities.  These laws require, among other things, full and truthful disclosure of material facts by public companies and broker-dealers in documents filed with the SEC.  One of the practices that the federal securities laws prohibit is "market manipulation," that is, conduct intended to deceive

investors by controlling or artificially affecting the market price of a stock.  When market manipulation occurs, the price that an investor pays for the stock generally is not an accurate reflection of the true market value of the stock.

3.    The federal securities laws also require disclosure of material information concerning the compensation paid to brokers and brokerage firms in connection with the purchase or sale of a particular stock.  In addition, underwriters are obligated to disclose their compensation -- by direct payment, ownership of securities and otherwise -- in connection with the issuance and sale of securities.  Disclosure of such material information is required so that customers can make a fully informed decision whether to rely on the recommendation or services of a broker or brokerage firm in buying or selling the stock.

4.    The federal securities laws prohibit companies from issuing stock unless the stock is registered with the SEC in a registration statement or the stock falls within a recognized exemption to the registration requirements.  One such exemption is set forth in Regulation S of the rules and regulations of the SEC.  Under Regulation S, stock may be issued without filing a registration statement if it is issued to a special category of persons, known as non-U.S. persons, under enumerated conditions, including that the stock not be resold within the United States until it has been held outside the country for more than 40 days. Stock issued under Regulation S, commonly referred to as "Reg. S"

stock, is typically issued at substantial discounts below the prevailing market price of the issuing company's securities.

5.   The National Association of Securities Dealers ("NASD") is an organization created pursuant to federal securities law, which, among other things, issues rules governing the conduct of broker-dealers and brokers of securities.

6.   A broker-dealer is an entity authorized to execute purchases and sales of securities for others and to take positions of its own in securities.  If the broker-dealer satisfies additional SEC and NASD requirements, such as maintaining sufficient capital, it may also underwrite the public sale of securities.  An underwriter of securities purchases the securities from an issuing company for resale to the public.  An issuing company's first sale of stock is commonly referred to as an initial public offering ("IPO").

7.   The NASD operates a national securities market known as the National Association of Securities Dealers Automated Quotation System ("NASDAQ"), an electronic system in which securities trades are executed through the use of computers. Once a trade is executed in a NASDAQ security, it is reported electronically to NASDAQ within ninety seconds.  This report to NASDAQ is accomplished after information concerning the trade is entered into a brokerage firm trader's NASDAQ work station.  From this work station, the report travels via interstate data communications lines to NASDAQ's main computer in Connecticut. From there, the report is disseminated via interstate

communications lines to all NASDAQ work stations throughout the world, including all fifty states and the Eastern District of New York.

8.   Securities are listed differently on the NASDAQ securities market depending on, among other factors, the size of the companies and market value of outstanding shares.  To be listed on the NASDAQ National Market, a company is required to have assets of at least $4 million and market capitalization of at least $3 million, among other requirements.  To be listed on the NASDAQ Smallcap Market, a company is required to have assets of at least $4 million and market capitalization of at least $1 million, among other requirements.

9.   The Over-the-Counter Bulletin Board (the "OTC Bulletin Board") is an electronic price quotation service for public companies that are not listed on a national stock exchange or on the NASDAQ National Market or Smallcap Market.  For a company to qualify for trading on the OTC Bulletin Board, a securities firm must file a statement of willingness to serve as a "market maker" for the company's securities by buying and selling shares for its own account and for the public.  Trading on the OTC Bulletin Board is conducted by means of the NASDAQ electronic price quotation system described in paragraph 7 above.

The Brokerage Firms

10.   From in or about and between October 1993 and July 1995, White Rock Partners & Co., Inc. ("White Rock") was a licensed securities firm with offices at 17 State Street, New

York, New York.  White Rock was operated as a partnership by the
defendant SALVATORE LAURIA, Felix Sater, Gennady Klotsman and
John Doe #1.

11.  In or about October 1995, White Rock was renamed
State Street Capital Markets Corporation ("State Street") when
John Doe #2 acquired the interest of John Doe #1.  State Street
continued the securities business that had been conducted at
White Rock and operated out of what had been White Rock's
offices.  State Street ceased operation in or about September
1996.

12.  The business of White Rock and State Street
consisted primarily of the underwriting of IPOs of stock in
thinly capitalized companies, that is, companies with minimal
assets and market value.  IPOs typically have the purpose of
raising money for the development and expansion of such
companies.  Pursuant to the IPOs underwritten by White Rock and
State Street, companies also sometimes sold "warrants," which
permitted purchasers to buy a specified number of shares at a
predetermined price.  After securities were sold pursuant to the
IPOs, White Rock and State Street also participated extensively
in the subsequent public trading of these securities (referred to
herein as "secondary market trading").

13.  In addition to selling securities they had
underwritten, White Rock and State Street sold securities that
had been underwritten by other securities firms.  White Rock and

State Street sold such securities as part of IPOs and in secondary market trading.

14.   The defendant SALVATORE LAURIA, together with his partners, supervised all aspects of White Rock's and State Street's business, including the recruitment and payment of brokers; the solicitation and structuring of securities underwritings; the trading of securities by White Rock and State Street, and by other securities firms acting in concert with White Rock and State Street; the management of client accounts; and the disbursement of profits generated by securities transactions.

15.   Because of Felix Sater's conviction for assault under New York State law in February 1993, Sater agreed with the National Association of Securities Dealers ("NASD") to restrict his activities at White Rock largely to  clerical duties, for which he would receive a minimal salary.  In fact, Sater received substantial compensation greatly exceeding his agreed-upon salary, and he took part in activities at White Rock and State Street, including the handling of securities and account statements, which violated the agreed-upon restrictions on his activities.

16.   White Rock and State Street traded in securities over the NASDAQ National Market, the NASDAQ Smallcap Market and the OTC Bulletin Board.  White Rock and State Street, and the underwriting and trading of securities in which these firms took

part, were subject to the federal securities laws, including the
rules and regulations of the SEC and NASD.

<u>THE ENTERPRISE</u>

17.   At all times relevant to this information, within
the Eastern District of New York and elsewhere, the defendant
SALVATORE LAURIA, together with others, constituted an enterprise
as defined in Title 18, United States Code, Section 1961(4), that
is, a group of individuals and entities associated in fact, which
engaged in, and the activities of which affected, interstate and
foreign commerce (hereafter, the "White Rock/State Street
Enterprise" or the "Enterprise").

18.   The chief goal of the White Rock/State Street
Enterprise was to obtain significant sums of money by selling
securities to investors on the basis of false and fraudulent
statements and omissions about, among other things, undisclosed
ownership and control of securities and substantial undisclosed
payments to induce brokers to sell these securities to the
public.   These fraudulent statements and omissions enabled the
Enterprise artificially to inflate and maintain the price of
securities sold to the public.   As individuals employed by and
associated with the Enterprise sold securities at artificially
inflated prices, substantial profits generated by the sales were

8

laundered through numerous off-shore and other nominee accounts, as described more fully below.

METHODS AND MEANS

19.   Among the methods and means by which the defendant SALVATORE LAURIA and other persons employed by and associated with the Enterprise conducted, and participated in the conduct of, the affairs of the Enterprise were the following:

a.   The defendant SALVATORE LAURIA and others acquired ownership and control of substantial blocks of common stock and warrants sold in connection with IPOs underwritten by White Rock, State Street and other securities firms and in connection with the secondary market trading of such stock and warrants.  LAURIA and other persons secured such ownership and control through various means, including the fraudulent issuance of securities pursuant to Regulation S and the private sale of securities to off-shore and domestic nominees.  LAURIA's and the other persons' ownership and control were not disclosed to the public in registration statements and other documents filed with the SEC, or in any other manner.

b.   The defendant SALVATORE LAURIA and others made substantial payments, in cash and securities, to induce brokers at White Rock, State Street and other brokerage firms to recommend and sell securities in connection with the aforementioned IPOs and secondary market trading.  The demand created by these payments produced an artificial inflation and maintenance of the prices of such securities.  The payments, and

the resulting manipulation of securities prices, were not disclosed to the public.

c.    The defendant SALVATORE LAURIA and others entered into undisclosed arrangements with brokerage firms other than White Rock and State Street, including the acquisition of undisclosed ownership interests in such firms.  Among these secret dealings were agreements by which other brokerage firms sold securities to investors in connection with White Rock's and State Street's IPOs and related secondary market trading for the purpose of artificially inflating and maintaining securities prices.  In return, the defendant SALVATORE LAURIA and other persons made payoffs in the form of cash and securities and often took part in the fraudulent IPOs and secondary market trading of other brokerage firms.

d.    The defendant SALVATORE LAURIA and others entered into undisclosed agreements with the officers of companies issuing securities in IPOs by which LAURIA and others secretly agreed to pay company officers a portion of the profits from the fraudulent sale of stock and warrants.

e.    The defendant SALVATORE LAURIA and others sold the stock and warrants that they secretly owned and controlled at artificially inflated prices.  These sales generated substantial profits which were not disclosed to investors in registration statements and other documents filed with the SEC, or in any other manner.

f.   The defendant SALVATORE LAURIA and others created off-shore companies and bank accounts and opened domestic brokerage accounts at White Rock, State Street and other brokerage firms in the names of these off-shore entities.  LAURIA and others used these brokerage accounts secretly to control large blocks of securities sold by White Rock, State Street and other securities firms in connection with IPOs and secondary market trading.  When the securities in the domestic brokerage accounts were sold at artificially inflated prices, the proceeds were typically electronically transferred to various off-shore bank accounts.  By means of these off-shore companies and accounts, LAURIA and others concealed and promoted their fraudulent securities transactions and unlawfully laundered the substantial profits generated by such transactions.

g.   The defendant SALVATORE LAURIA and others entered into undisclosed arrangements with members and associates of La Cosa Nostra organized crime families ("LCN Families").  To achieve the purposes of the Enterprise, LAURIA and other persons sought the assistance of members and associates of LCN Families concerning, among other matters, the resolution of financial and other disputes, the hiring and retention of brokers, the business affairs of companies whose stock and warrants were sold by White Rock and State Street, and the efforts to deter persons who sought to reduce the price of securities sold by White Rock and State Street through such techniques as "short selling."  In return for this assistance, LAURIA and others paid members and

associates of LCN families compensation in the form of securities and the proceeds of fraudulent sales of securities.

## THE RACKETEERING CHARGE

20. In or about and between March 1993 and September 1998, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant SALVATORE LAURIA, together with others, being persons employed by and associated with the White Rock/State Street Enterprise, which Enterprise engaged in, and the activities of which affected, interstate and foreign commerce, did knowingly and intentionally conduct and participate, directly and indirectly, in the conduct of the affairs of the Enterprise through a pattern of racketeering activity as defined in Title 18, United States Code, Sections 1961(1) and 1961(5), as set forth below.

## First Racketeering Act
## Countryworld Casinos, Inc. Securites Fraud

21. In or about and between March 1993 and September 1996, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant SALVATORE LAURIA, together with others, did knowingly and willfully use and employ manipulative and deceptive devices and contrivances in violation of Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission (Title 17, Code of Federal Regulations, Section 240.10b-5), in that the defendant SALVATORE LAURIA did (a) employ devices, schemes and artifices to defraud; (b) make untrue

statements of material facts and omit to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engage in acts, practices and courses of business which would and did operate as a fraud and deceit upon members of the investing public, in connection with purchases and sales of securities of Countryworld Casinos, Inc. ("Countryworld"), and by use of means and instrumentalities of interstate commerce and the mails, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

22.   It was part of the scheme that the defendant SALVATORE LAURIA, together with others, acquired ownership and control of substantial blocks of Countryworld common stock through a fraudulent issuance of stock pursuant to Regulation S, which ownership and control were not disclosed to the public.

23.   It was further part of the scheme that the defendant SALVATORE LAURIA, together with others, paid substantial undisclosed compensation to brokers to induce them to recommend and sell Countryworld stock and warrants to the investors.

24.   It was further part of the scheme that the defendant SALVATORE LAURIA and others sold Countryworld shares that they secretly controlled at artificially inflated prices, thereby generating substantial profits.

## Second Racketeering Act
### Holly Products, Inc. and Holly Holdings, Inc. Securities Fraud

25. In or about and between March 1994 and September 1996, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant SALVATORE LAURIA, together with others, did knowingly and willfully use and employ manipulative and deceptive devices and contrivances in violation of Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission (Title 17, Code of Federal Regulations, Section 240.10b-5), in that the defendant SALVATORE LAURIA did (a) employ devices, schemes and artifices to defraud; (b) make untrue statements of material facts and omit to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engage in acts, practices and courses of business which would and did operate as a fraud and deceit upon members of the investing public, in connection with purchases and sales of securities of Holly Products, Inc. and Holly Holdings, Inc. (collectively referred to herein as "Holly Products"), and by use of means and instrumentalities of interstate commerce and the mails, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

26. It was part of the scheme that the defendant SALVATORE LAURIA, together with others, acquired ownership and control of a substantial number of Holly Products common stock

shares and warrants, which ownership and control were not disclosed to the public.

27.   It was further part of the scheme that the defendant SALVATORE LAURIA, together with others, paid substantial undisclosed compensation to brokers to induce them to recommend and sell Holly Products common and preferred stock and warrants to investors.

28.   It was further part of the scheme that the defendant SALVATORE LAURIA and others sold Holly Products common stock shares and warrants that they secretly controlled at artificially inflated prices, thereby generating substantial profits.

## Third Racketeering Act
## U.S. Bridge of N.Y., Inc. Securities Fraud

29.   In or about and between December 1994 and September 1996, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant SALVATORE LAURIA, together with others, did knowingly and willfully use and employ manipulative and deceptive devices and contrivances in violation of Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission (Title 17, Code of Federal Regulations, Section 240.10b-5), in that SALVATORE LAURIA did (a) employ devices, schemes and artifices to defraud; (b) make untrue statements of material facts and omit to state material facts necessary in order to make the statements made, in light of the circumstances

under which they were made, not misleading; and (c) engage in acts, practices and courses of business which would and did operate as a fraud and deceit upon members of the investing public, in connection with purchases and sales of securities of U.S. Bridge of N.Y., Inc. ("U.S. Bridge"), and by use of means and instrumentalities of interstate commerce and the mails,  in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

30.  It was part of the scheme that the defendant SALVATORE LAURIA, together with others, acquired ownership and control of a substantial number of U.S. Bridge common stock shares and warrants, which ownership and control were not disclosed to the public.

31.  It was further part of the scheme that the defendant SALVATORE LAURIA, together with others, paid substantial undisclosed compensation to brokers to induce them to recommend and sell U.S. Bridge stock and warrants to investors.

32.  It was further part of the scheme that the defendant SALVATORE LAURIA and others sold U.S. Bridge shares and warrants that they secretly controlled at artificially inflated prices, thereby generating substantial profits.

## Fourth Racketeering Act
## Cable & Co., Inc. Securities Fraud

33.  In or about and between January 1996 and September 1996, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant

SALVATORE LAURIA, together with others, did knowingly and willfully use and employ manipulative and deceptive devices and contrivances in violation of Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission (Title 17, Code of Federal Regulations, Section 240.10b-5), in that the defendant SALVATORE LAURIA did (a) employ devices, schemes and artifices to defraud; (b) make untrue statements of material facts and omit to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engage in acts, practices and courses of business which would and did operate as a fraud and deceit upon members of the investing public, in connection with purchases and sales of securities of Cable & Co., Inc. ("Cable"), and by use of means and instrumentalities of interstate commerce and the mails, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

34.  It was part of the scheme that the defendant SALVATORE LAURIA, together with others, acquired ownership and control of a substantial number of Cable common stock shares and warrants, which ownership and control were not disclosed to the public.

35.  It was further part of the scheme that the defendant SALVATORE LAURIA, together with others, paid substantial undisclosed compensation to brokers to induce them to recommend and sell Cable stock and warrants to investors.

36.   It was further part of the scheme that the defendant SALVATORE LAURIA and others sold Cable shares and warrants that they secretly controlled at artificially inflated prices, thereby generating substantial profits.

### Fifth Racketeering Act
### Fun-Tyme Concepts, Inc. Securities Fraud

37.   In or about and between January 1996 and September 1996, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant SALVATORE LAURIA, together with others, did knowingly and willfully use and employ manipulative and deceptive devices and contrivances in violation of Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission (Title 17, Code of Federal Regulations, Section 240.10b-5), in that the defendant SALVATORE LAURIA did (a) employ devices, schemes and artifices to defraud; (b) make untrue statements of material facts and omit to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engage in acts, practices and courses of business which would and did operate as a fraud and deceit upon members of the investing public, in connection with purchases and sales of securities of Fun-Tyme Concepts, Inc. ("Fun-Tyme"), and by use of means and instrumentalities of interstate commerce and the mails, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

38.   It was part of the scheme that the defendant SALVATORE LAURIA, together with others, acquired ownership and control of a substantial number of Fun-Tyme common stock shares and warrants, which ownership and control were not disclosed to the public.

39.   It was further part of the scheme that the defendant SALVATORE LAURIA, together with others, paid substantial undisclosed compensation to brokers to induce them to recommend and sell Fun-Tyme stock and warrants to investors.

40.   It was further part of the scheme that the defendant SALVATORE LAURIA and others sold Fun-Tyme shares and warrants that they secretly controlled at artificially inflated prices, thereby generating substantial profits.

## Sixth Racketeering Act
### Money Laundering

41.   In or about and between October 1993 and September 1998, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant SALVATORE LAURIA, together with others, knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, did knowingly and intentionally conduct and attempt to conduct financial transactions, in and affecting interstate and foreign commerce, which in fact involved the proceeds of a specified unlawful activity, to wit: securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and mail and wire fraud, in violation of Title

19

18, United States Code, Sections 1341 and 1343, (a) with the intent to promote the carrying on of said specified unlawful activity, and (b) knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership and control of the proceeds of said specified unlawful activity, in violation of Title 18, United States Code, Sections 1956(a)(1)(A)(i) and 1956(a)(1)(B)(i).

(Title 18, United States Code, Sections 1962(c), 1963(a) and 3551 et seq.)


ZACHARY W. CARTER
United States Attorney
Eastern District of New York


BY: _____
ACTING UNITED STATES ATTORNEY
PURSUANT TO 28 C.F.R. 0.131

# AFFIDAVIT OF MAILING

STATE OF NEW YORK
COUNTY OF KINGS
EASTERN DISTRICT OF NEW YORK, ss:

_____ , being duly sworn, says that on the _____ day of

_____ , I deposited in Mail Chute Drop for mailing in the U.S. Courthouse,

Cadman Plaza East, Borough of Brooklyn, County of Kings, City and State of New York, a _____

_____ of which the annexed is a true copy, contained in a securely

enclosed postpaid wrapper directed to the person hereafter named, at the place and address stated below:

_____

_____

_____

Sworn to before me this
    day of

_____

_____

# AFFIDAVIT OF PERSONAL SERVICES

STATE OF NEW YORK
COUNTY OF KINGS
EASTERN DISTRICT OF NEW YORK, ss:

_____ , being duly sworn, says that he is employed in the office of

the United States Attorney for the Eastern District of New York. That on the _____ day of _____ ,

he served a true copy of the annexed _____ on the office of

attorney for _____ herein, located at

_____ , Borough of _____ , City of New York, by leaving

a true copy of same with his clerk or other person in charge of said office.

_____

Sworn to before me this
    day of

_____

Form No. USA-52a-6a
(Rev. 7/82)